U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed October 6, 2006

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JAMES B. METCALF, | § | CASE NO. 05-34150-SGJ-7 |
| | § | |
| D E B T O R. | § | |
| | § | |
| | § | |
| LAMESA ECONOMIC DEVELOPMENT | § | |
| CORPORATION, | § | |
| | § | |
| PLAINTIFF, | § | |
| VS. | § | ADVERSARY NO. 05-3638 |
| | § | |
| JAMES B. METCALF, | § | |
| | § | |
| DEFENDANT. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

INTRODUCTION

In this Adversary Proceeding, Plaintiff seeks a determination by the court that all liability of Debtor-Defendant on a certain promissory note dated April 20, 2004, in the

original principal amount of $150,000, is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) because Debtor-Defendant falsely represented how the loan proceeds would be used. It is alleged that the false representation was relied upon by Plaintiff in extending credit to Debtor-Defendant, to Plaintiff's detriment. The court presided over a trial of this proceeding on September 26, 2006.

## FINDINGS OF FACT

### A. Stipulated Facts

The parties have stipulated to the following facts:

1. This court has jurisdiction over this adversary proceeding pursuant to 11 U.S.C. § 1334 and 28 U.S.C. § 157.

2. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

3. Defendant is an individual who is a Chapter 7 Debtor in Case No. 05-34150SGJ-7.

4. Plaintiff, which will sometimes be referred to by the Court as LEDC, is an unsecured creditor scheduled in the Debtor's bankruptcy case.

5. On April 20, 2004, FingerPrint Graphics, LLC ("Fingerprint"), and an individual named Drew Brauer ("Mr. Brauer"), and the Debtor James Metcalf (the "Debtor"), each

-2-

executed, as makers (collectively, the "Borrowers"), a promissory note payable to LEDC in the original principal amount of $150,000.00 (hereinafter this will sometimes be referred to as the "LEDC Note").

6. As security for payment of the LEDC Note, FingerPrint executed one or more security agreements.

7. The balance due and owing on the LEDC Note was $164,736.22 as of September 25, 2006, with interest accruing at $62.03 per diem.

## B. Adjudicated Facts

The following constitute additional findings of fact by the court, based on the evidence presented:

1. The documentary evidence submitted at trial reflected that Fingerprint is or was a Texas limited liability company and that Mr. Brauer and the Debtor were both members of Fingerprint. Mr. Brauer was, according to the LEDC loan documents, the duly elected and acting manager of Fingerprint at the time he executed the LEDC Note. The further evidence, through testimony, was that Mr. Brauer put approximately $350,000 of his personal funds into the business and was involved with obtaining the $150,000 loan from LEDC but was largely a passive member of Fingerprint until mid-May 2004 when he "took over" the company. The further

-3-

testimony indicated that the Debtor also had an ownership interest in Fingerprint, and had invested a small amount of money into it, but basically "ran the business from his home" and acquired his ownership interest from the labor he put into it. The evidence was also that the Debtor maintained the checking accounts for Fingerprint until mid-May 2004 when Mr. Brauer took over this and other duties.

2.     Plaintiff is a quasi governmental entity—a development corporation—associated with the City of Lamesa, Texas.  LEDC has various board members that are appointed by the Lamesa, Texas City Council.  LEDC's primary function is to promote economic development in Lamesa, Texas.

3.     The Plaintiff alleges that the $150,000 of funds loaned by it were to be used to improve the real property located in downtown Lamesa at 118 South Austin Avenue, in order for the Borrowers to operate a print shop there.  Hereinafter, the court will refer to this real property as the Austin Avenue Property.

4.     Prior to obtaining the funds from LEDC, LEDC alleges that the Debtor and Mr. Brauer orally represented that all or virtually all of the loan proceeds would be used to improve the Austin Avenue Property and, among such improvement, would be the purchase and installation of a four color offset printing press

-4-

(the "Press").

5. LEDC asserts that it relied on this representation in making the loan.

6. The Borrowers defaulted after only three monthly payments and only minimal improvements had been made to the Austin Avenue Property. No printing press was ever installed at the Austin Avenue Property. Basically the only improvement was the start of demolition of the floor in the building at the real property. LEDC later foreclosed on the Austin Avenue Property.

7. The loan documents submitted into evidence do not provide expressly that the $150,000 of LEDC loan proceeds would be used to improve the Austin Avenue Property and to purchase and install the Press. However, the Loan Agreement that was submitted into evidence does provide at page 1 that **"To induce LEDC to make the loan . . . Fingerprint, Jim Metcalf and Drew Brauer have agreed to the matters contained in this Loan Agreement. . . .** [and then skipping over to the top of page 2 it reads that] **"Jim Metcalf, Drew Brauer and Fingerprint represent and warrant to LEDC as follows:** [skipping forward to paragraph 1.c. of the Loan Agreement, there is a representation and warranty that] **"Fingerprint has contracted to purchase a Heidelberg Quickmaster Direct Imaging Four Color Offset Press**

**pursuant to a Sale Contract . . .dated April 2, 2004 . . . . As a material consideration for LEDC making the above mentioned loan, Fingerprint agrees to locate and maintain such Press at 118 South Austin Avenue, Lamesa . . . at all times until the above described Promissory Note is paid in full."** [Skipping to paragraph 2], **"To induce Fingerprint to locate the Press in Lamesa, Texas, LEDC has acquired that real property** [the Loan Agreement goes on to describe the Austin Avenue property,] **and has conveyed, or will convey, such real property to Fingerprint. All of Fingerprint's obligations under the above described note and this agreement shall be secured by a first deed of trust lien on said real property. Fingerprint agrees to improve such real property as Fingerprint deems appropriate for the conducting of its business and the installation of the Press utilizing local contractors . . . ."**

8.    The Loan Agreement as well as separate documentation, including the Promissory Note itself, as well as a separate Deed of Trust and a Security Agreement submitted into evidence, indicated that Lamesa was, as part of its loan, being given a lien in the Austin Avenue Property and a security interest in the to-be-acquired Press, and this was a fundamental aspect of the loan.

-6-

9.    The Debtor takes the position that it is fatal to the Plaintiff's case and specifically to the Section 523(a)(2)(A) allegations that the loan documents themselves do not expressly provide that the $150,000 of loan proceeds would be used for improving the Austin Avenue Property, and that Plaintiff should not be allowed to submit into evidence "parol evidence"—*i.e.,* oral statements of the Debtor and others—to argue that false representations were made to Plaintiff regarding usage of the loan proceeds, to establish a Section 523(a)(2)(A) cause of action.  The Debtor argues that LEDC was just plain imprudent in not getting the alleged agreement to use the $150,000 to improve the Austin Avenue Property into the loan documents, and, thus, LEDC now should suffer the consequences.

10.    This court disagrees with this position.  This court can consider evidence of oral statements made in connection with the LEDC Loan, so long as the oral statements are not being offered to contradict or vary the terms of the written documents. The evidence regarding the oral statements did not contradict or vary what was in the loan documents.  On the contrary, the oral statements allegedly made by the Debtor were entirely consistent with the terms and spirit of the loan documents and consistent with what a reasonable person might infer the expectations of an

-7-

entity such as the LEDC to be.

11. Turning to those oral statements, there was testimony at the trial, especially through David Nicks, a former board member of the LEDC, that the Court found to be entirely credible. Mr. Nicks testified that, although LEDC initially approved the $150,000 loan to the Borrowers sometime in spring 2004, after LEDC had done background investigations, the City Council of Lamesa always must ultimately approve these sorts of loans.

12. Mr. Nicks further testified that there was a Lamesa City Council public meeting on April 19, 2004, and, at such meeting, there was much discussion about the LEDC loan and concern was expressed by various attendees at such meeting about the loan proceeds being used *in* Lamesa. A recess was taken during the meeting and, at such time, approval of the loan seemed bleak. After the recess, the Mayor of Lamesa asked explicit questions regarding how the loan proceeds would be used. The testimony was that the Debtor had represented at the City Council meeting that the loan proceeds would be used toward renovation of the Austin Avenue Property. Also, there were representations about the Press having already been ordered and that it would be installed at the property. The testimony was that these representations "sealed the deal." The sentiment at the City

-8-

Council meeting was that—even if there was ultimately a default or failure of the Debtor's business—at least the city of Lamesa would have an improved parcel of real property.  The Austin Avenue Property was an old dry goods store.  There were roof and structural issues with the property and the heating and cooling system was not good.

13.  There was additional testimony that no financial statements were produced by Fingerprint to LEDC.  However, the reason given was that it was a recent start up company without any meaningful track record yet to produce a financial statement and that typically a company like this would be going to a conventional lender if it had the financial wherewithal or a solid financial statement.

14.  The Debtor and Mr. Bauer also testified that there was some concern expressed at the City Council meeting about the financial stability of Fingerprint because "someone" had heard about a couple of bounced checks.  There was also testimony from the Debtor himself that in response to the questions regarding the company's financial condition, he said something to the effect of "checks bouncing happens with a lot of start ups," which placated the City Council, facilitating their approval of the loan.  The Debtor also admits that he made the representation

at the City Council meeting that Fingerprint was "solvent."

15. Finally, the evidence was that on April 20, 2004, the $150,000 of Loan Proceeds were deposited into a Fingerprint bank account at Lea County State Bank (one of 6 or 8 bank accounts it had access to). This account was overdrawn at the time and there had been close to two dozen NSF checks drawn against this account during April 2004, according to Exhibit 9 submitted during trial. By May 2, 2004, this bank account had been drained down to a mere $2,830.84 balance. Fingerprint never acquired the Press. The Debtor testified that he wrote checks to get the Lamesa project started after receipt of the $150,000. The Debtor also testified that he used the funds to pay employees in Lamesa, in Brownsville, and in Hobbs. The Debtor testified that the only work regarding renovation of the building at Austin Avenue that was begun was demolition of the floor in the building.

### CONCLUSIONS OF LAW

1. The issue before this court is whether the Debtor obtained "money [from the Plaintiff] by false pretenses, a false representation, or actual fraud, other than a statement respecting the Debtor's or an insider's financial condition," which is language lifted from Section 523(a)(2)(A).

2. Here, this boils down to whether the Debtor obtained

the LEDC Loan by making false representations to LEDC regarding how the LEDC loan proceeds would be spent.

3.   "A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).  The court notes that oral statements by a debtor's insider concerning the debtor's financial condition do not fall within the scope of Section 523(a)(2)(A).  *Blackwell v. Dabney*, 702 F.2d 490 (4th Cir. 1983).

4.   The standard of proof for a plaintiff in an action under Section 523(a) is preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995).  Exceptions to discharge are construed in favor of the debtor with a view to the policy that the Bankruptcy Code provides a fresh start to debtors.  *McCoun v. Rea (In re Rea)*, 245 B.R. 77, 84 (Bankr. N.D. Tex. 2000).  "But the Code does not create a haven for wrongdoers.  Rather the Code gives 'the honest but unfortunate debtor who surrenders his [non-exempt] property a new opportunity in live unhampered by pre-

existing debt.'" *Id*. at 85 (*quoting In re Davis*, 194 F.3d 570 (5th Cir. 1999)).

5.   In order to show a debt is nondischargeable pursuant to Section 523(a)(2)(A), the creditor must show (1) that the debtor made representations other than a statement concerning his financial condition, (2) that at the time the debtor made the representations he or she knew they were false, (3) that the debtor made the representations with the intention and purpose to deceive the creditor, (4) that the creditor justifiably relied on such representations, and (5) that the creditor sustained losses as a proximate result of the false representations. *In re Acosta*, 406 F.3d 367 (5th Cir. 2005); *RecoverEdge*, 44 F.3d. at 1293; *In re Rea*, 245 B.R. at 85; *Manheim Automotive Fin. Serv., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131 (Bankr. N.D. Tex. 2005).

6.   False representations need not be overt.  "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation." *AT&T Universal Card Services v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001). Misrepresentations may also be made through conduct. *Id*. Intent to deceive may be inferred from "a reckless disregard for the truth or falsity of the statement." *In re Acosta*, 406 F.3d

at 372. "Intent of a kind sufficient to preclude discharge for
debt for money obtained by debtor's false pretenses, false
representation or actual fraud may be inferred where a debtor
makes a false representation and knows or should know that the
statement will induce another to act." *In re Hurst*, 337 B.R. at
133. When examining a debtor's intent under Section
523(a)(2)(A), this court is charged to consider whether the
circumstances in the aggregate present a picture of deceptive
conduct on the part of a debtor, which betrays an intent on the
part of the debtor to deceive his creditors. *Id*. Where the
debtor intends or has reason to expect a creditor to act in
reliance upon the debtor's representations, there is an intent to
deceive on the part of the debtor. *Id*.

7. In evaluating a cause of action under Section
523(a)(2)(A), whether it is a question of false pretenses or of
false representation or of actual fraud, the court must determine
that the plaintiff *justifiably* relied upon the representations
made to her by the defendant. *Field v. Mans*, 516 U.S. 59, 61
(1995). "A person is justified in relying on a representation of
fact 'although he might have ascertained the falsity of the
representation had he made an investigation.'" *Id*. at 69 (quoting
the Restatement (Second) of Torts (1976)). *This is not a*

-13-

*"reasonable man" standard. Id*. at 70. Rather, justification of
the reliance "'is a matter of the qualities and characteristics
of the particular plaintiff, and the circumstances of the
particular case, rather than of the application of a community
standard of conduct in all cases.'" *Id*. at 71. Only where, under
the circumstances, the facts should be apparent to a person of
the plaintiff's knowledge and intelligence from a cursory glance,
or where the plaintiff has discovered something that should serve
as a warning that he or she is being deceived, is the plaintiff
required to make an investigation of his or her own." *Id.*
(quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)).
Justifiable reliance turns upon the plaintiff's own capacity and
knowledge, or the knowledge with which the plaintiff may be
fairly charged to have from the facts within his or her
observation in light of his or her individual case. *Id*. at 72.
*"Justifiable reliance is a lesser standard than reasonable
reliance"* (which is a statutory element of Section 523(a)(2)(B)),
although it does not leave reason entirely out of the calculus.
*Id*. at 76.

    8.  Thus, here, the court must consider who the Plaintiff
is and whether it was justifiable for an entity such as LEDC—not
a sophisticated bank lender but a small town quasi-governmental

-14-

entity in the business of promoting economic development in
Lamesa, Texas—to believe and rely upon the oral statements of the
Debtor that the money lent would be used to improve the Austin
Avenue Property.

9.    It is perfectly justifiable for a city development
board and the city council of that board to rely upon an oral
representation that the money will be used in that city, given
that this is the whole point of the existence of the LEDC board
and the fund from which the loan was made.

10.   One representation made both orally and on paper— that
Fingerprint was under contract to purchase the Press—was true
inasmuch as they had recently made a $10,000 downpayment on one
of the machines with the Heidelberg company.

11.   The Debtor's oral representations about how the money
would be used (*e.g.,* to buy the press and to fix up the building)
did not have to be in writing or in the writing.  This is like
selling a horse and when the person says, "I heard this horse has
a heart problem," but the seller tells the person that the horse
is sound knowing full well that the horse has a heart problem.
The representation that the horse is sound is a false
representation meant to facilitate the sale of an unsound horse.
This falls squarely within the examples of justifiable reliance

-15-

in *Field v. Mann*, 516 U.S. 59 (1995).

12. LEDC did not need to request financials in order to be able to recover here. This notion suggests LEDC had to do more due diligence than it did. But due diligence is the reasonable man standard, which is the standard of reliance for Section 523(a)(2)(B). Justifiable reliance, on the other had, which is the standard under Section 523(a)(2)(A), is subjective and "is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct in all cases." *Field v. Mann*, 516 U.S. at 71. A plaintiff must use its senses to make a cursory examination, but need not conduct an investigation of the fact. Justifiable reliance turns on the plaintiff's own capacity and knowledge and to use its senses. Plaintiff cannot blindly rely on statements in face of facts that make the falsehood obvious. But plaintiff doesn't have to investigate the veracity of the statements.

13. In summary, this court finds and concludes that the Debtor represented to the LEDC and City Council that Fingerprint would use the $150,000 of loan proceeds to improve the Austin Avenue Property and to finish purchasing the Press and to install it at the Austin Avenue Property. He made this statement with

-16-

reckless indifference to the truth at a time when he knew that the present situation with regard to Fingerprint was that is was bouncing checks right and left and not making ends meet. He had to know that he intended to turn right around and spend the money on other needs of the business. The timing of his subsequent actions—in spending the loan proceeds for other purposes in well under a month after the LDC Loan was closed—is very telling on the issue of the Debtor's present intent at the time of making the representations to the City Council. The Debtor's conduct was deceptive. He exhausted the loan proceeds in approximately 2 weeks. Fingerprint, through the Debtor and Mr. Brauer, never did a thing to improve the property worth mentioning. The court finds this to be overt and blatant obtaining of funds by false pretenses based on the record before the court.

14. LEDC shall have a nondischargeable judgment pursuant to Section 523(a)(2)(A) in the amount of $164,736.22 as of September 25, 2006, with interest accruing at $62.03 per diem.

## CONCLUSION

The court will enter a Judgment consistent with this ruling. The court reserves the right to make further findings of fact and conclusions of law.

###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###

-17-